UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| SHAWN SIMPSON, | CASE NO. 3:23-CV-01994-JGC |
| Plaintiff, | JUDGE JAMES G. CARR |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## INTRODUCTION

Plaintiff Shawn Simpson challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On October 12, 2023, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry of Oct. 12, 2023). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

Mr. Simpson filed for DIB and SSI in January 2020, alleging a disability onset date of August 1, 2010. (Tr. 164-71, 173). The claims were denied initially and on reconsideration. (Tr. 65-85). Mr. Simpson then requested a hearing before an Administrative Law Judge. (Tr. 115-16). Mr. Simpson (represented by counsel) and a vocational expert (VE) testified before the ALJ on

January 11, 2021. (Tr. 41-62). On January 20, 2021, the ALJ determined Mr. Simpson was not disabled. (Tr. 23-40). After the Appeals Council denied Mr. Simpson's request for review, he appealed to this Court and the parties jointly stipulated to remand the case for further proceedings. (Tr. 1-7, 594-97).

On August 25, 2022, the Appeals Council vacated its decision and remanded the case. (Tr. 610-12). It determined the ALJ did not adequately evaluate the medical opinion of Mr. Simpson's treating physician and ordered the ALJ give further consideration to his residual functional capacity (RFC) and evaluate the medical source opinion in accordance with 20 C.F.R. §§ 404.1520c and 416.920c. (Tr. 610-11). The ALJ held another hearing and, on January 13, 2023, issued a second unfavorable decision. (Tr. 511-35). The Appeals Council denied Mr. Simpson's request for review, making the second decision the final decision of the Commissioner. (Tr. 499-502; *see* 20 C.F.R. §§ 404.984(b)(2) & 416.1484(b)(2)). Mr. Simpson timely filed this action on October 12, 2023. (ECF #1).

FACTUAL BACKGROUND

## I.  PERSONAL AND VOCATIONAL EVIDENCE

Mr. Simpson was 40 years old on the alleged onset date, and 52 years old at the second administrative hearing. (Tr. 65). He obtained his GED and worked as a tree trimmer, landscaper, laborer, driver, and chimney sweep. (Tr. 239-40).

## II.  RELEVANT MEDICAL EVIDENCE

In October 2018, Mr. Simpson met with orthopedic doctor Christopher Bechtel, M.D., for evaluation of bilateral knee pain. (Tr. 446). There, Mr. Simpson endorsed knee pain for a number of years that worsens with physical activity. (*Id.*). Physical examination revealed mild crepitus, mild

2

tenderness over the patella, and medial joint-line tenderness on palpation. (*Id.*). Dr. Bechtel noted radiographs of both knees demonstrated early medial compartment degenerative changes with joint space narrowing and early osteophyte formation and determined Mr. Simpson's pain results from bilateral mild-to-moderate osteoarthritis. (*Id.*). He recommended a course of anti-inflammatories and possibly a cortisone injection, but Mr. Simpson declined. (Tr. 447).

On July 25, 2019, Mr. Simpson met with Megan Oberhauser, D.O., to establish care. During the office visit, Mr. Simpson denied back pain, neck pain, and joint pain. (Tr. 294). On physical examination, he had normal range of motion and normal strength, each without tenderness, swelling, or deformity. (Tr. 295). Mr. Simpson complained his blood pressure medication made him very tired. (*Id.*). Dr. Oberhauser switched his blood pressure medication to chlorthalidone. (*Id.*).

Mr. Simpson returned to Dr. Oberhauser's office on October 3, 2019, for a follow-up appointment and reported having a lot of joint pain. (Tr. 289). Physical examination showed normal range of motion without tenderness. (Tr. 290-91). Dr. Oberhauser ordered knee and shoulder X-rays and referred Mr. Simpson to an orthopedist for a consultation. (Tr. 291).

Shoulder X-rays showed no radiographic evidence of an acute fracture or dislocation, and the joint spaces were well preserved without significant degenerative changes. (Tr. 300). Knee X-rays revealed mild joint space narrowing and small marginal osteophytes present in the medial compartment of the left knee; the joint spaces were otherwise well preserved. (Tr. 301).

On October 29, 2019, Mr. Simpson met with Julie Farrier, PA-C, for evaluation of his bilateral knee pain. (Tr. 309). He reported bilateral tibial open fractures that required internal fixation about seventeen years ago and endorsed a 13-year history of pain along the front medial

lateral posterior aspect of the knees that has gradually worsened. (*Id.*). PA Farrier observed leg scars consistent with open reduction and internal fixation of the bilateral tibia. (Tr. 310). On physical examination, PA Farrier noted the right knee was neurovascularly intact with medial and lateral joint line tenderness and a positive McMurray test, and mild effusion, tenderness of the medial joint line, medial femoral condyle, and lateral joint line in the left knee. (*Id.*). PA Farrier assessed left knee arthritic and chronic right knee pain and suggested bracing, cortisone injections, and therapy. (*Id.*). Mr. Simpson declined, stating he was "against cortisone injections," did not understand how physical therapy would work, and was "adamantly against surgery." (*Id.*). PA Farrier offered Voltaren gel. (*Id.*).

On January 17, 2020, Mr. Simpson returned to Dr. Oberhauser's office, complaining of continued knee and shoulder pain and chest pains. (Tr. 298). Mr. Simpson informed Dr. Oberhauser he did not try the Voltaren gel because he did not like the chemicals in it. (*Id.*). On physical examination, Mr. Simpson displayed normal movement of all extremities but endorsed pain with abduction and rotation of the bilateral shoulders. (Tr. 299). Dr. Oberhauser did not observe joint swelling. (*Id.*). When Mr. Simpson declined to return to PA Farrier for injections, Dr. Oberhauser prescribed gabapentin. (Tr. 297).

On May 20, 2020, Mr. Simpson informed Dr. Oberhauser of continued shoulder and knee discomfort that worsened with movement. (Tr. 362). He also endorsed flank pain. (*Id.*). He again stated he did not want to do physical therapy and requested a shoulder MRI. (*Id.*). On physical examination of his shoulders, Mr. Simpson had full passive range of motion and some limited range of motion due to pain. (*Id.*). Dr. Oberhauser did not observe joint swelling. (Tr. 364). She referred Mr. Simpson to an orthopedist for evaluation. (Tr. 362).

4

On June 10, 2020, Mr. Simpson met with orthopedist nurse practitioner Carrie Hancock, C.N.P., and described bilateral shoulder pain and endorsed difficulty with simple movements such as reaching to scratch his back and retrieving a cup from the cupboard. (Tr. 374). He explained that he overuses his left shoulder to compensate for his right shoulder deficits, especially when working. (*Id.*). On physical examination, NP Hancock noted the following:

> Upon examination the patient verbalized quite a bit of pain while assessing the shoulders. With any type of range of motion testing the patient quickly stopped and verbalized that he was unable to do the movements. There was no visible deformity in either shoulder. From the limited exam upon palpation the patient was tender along bilateral acromioclavicular joints with tenderness at the bicep tendon.

(*Id.*). Mr. Simpson declined cortisone injections because he did not like the idea of needles, declined a course of physical therapy because it "is a waste of time," and requested MRIs on both shoulders to determine the exact cause of his pain. (*Id.*).

On August 19, 2020, Mr. Simpson returned to Dr. Oberhauser's office and complained of continued wrist pain, back pain, and joint stiffness. (Tr. 391-92). He reported that gabapentin did not relieve his pain and described his right wrist freezing up when he mowed the lawn. (Tr. 391). On physical examination, Mr. Simpson exhibited normal movement in all extremities but endorsed pain with flexion and extension of the wrists and with abduction of the shoulders. (Tr. 393). Dr. Oberhauser felt Mr. Simpson had osteoarthritis in multiple joints without suggestion of an autoimmune disease. (Tr. 391). She ordered wrist X-rays and prescribed tizanidine for right-sided sciatica. (*Id.*).

On August 31, 2020, Mr. Simpson met with NP Hancock and complained of shoulder pain, bilateral wrist pain traveling to his elbow, and pain with numbness and tingling in his hands and fingers that worsens when he tries to lie down. (Tr. 419). He had not tried medications or

bracing for pain and explained he did not think they would help. (*Id.*). On physical examination, he exhibited tenderness and positive Phalen's and Tinel's signs bilaterally and endorsed decreased sensation at the right wrist. (Tr. 421-22.) An MRI of the right shoulder revealed rotator cuff tendinosis with intermediate grade partial-thickness irregular bursal-sided tear of the central cuff, moderate acromioclavicular osteoarthritis with subacromial and subdeltoid bursitis, and mild glenohumeral osteoarthritis. (Tr. 422.) The left shoulder showed rotator cuff tendinosis with low-grade bursal-sided fraying without discrete tear and mild glenohumeral and acromioclavicular osteoarthritis. (*Id.*). NP Hancock ordered bilateral upper extremity EMGs and offered bilateral cortisone injections and physical therapy. (*Id.*). Mr. Simpson declined injections and agreed to start physical therapy. (*Id.*).

A nerve conduction and EMG study revealed the following:

> There is electrodiagnostic evidence of a right median nerve entrapment at the wrist with some sensory axonal damage. Incidentally, there is also electrodiagnostic evidence of a left ulnar nerve entrapment across the elbow without any axonal damage. There is no electrodiagnostic evidence of bilateral cervical radiculopathy, brachial plexopathy, right ulnar neuropathy, or left median neuropathy at this time. Clinical correlation is suggested.

(Tr. 494).

On October 27, 2020, Mr. Simpson returned to Dr. Oberhauser's office with new complaints of joint pain and stiffness in his hands. (Tr. 462). He endorsed that everything else still hurts and he stopped taking tizanidine because it only made him sleep. (*Id.*). Mr. Simpson also reported attending physical therapy. (*Id.*). He requested a referral for a new orthopedist because he was displeased that NP Hancock did not review his MRI with him and he still does not know what is wrong with his shoulders. (*Id.*). Physical examination was normal. (Tr. 464). Dr. Oberhauser

provided a second orthopedist referral and X-rays of the lumbar spine that showed spondylosis and facet arthropathy, moderate-to-severe at L5-S1 and mild at L4-L5. (Tr. 461, 465).

On November 10, 2020, Mr. Simpson met with orthopedist Michael Fisher, D.O., for evaluation of diffuse pain throughout his body, bilateral shoulder pain that radiates into his wrists, hands, and fingers, back pain radiating down both legs, and bilateral knee pain. (Tr. 481). He stated his pain is worse with movement and better with rest. (*Id.*). On physical examination, Mr. Simpson endorsed pain with any motion in the anterior lateral aspect of the shoulder, positive Hawkins and Neer tests, normal strength in the rotator cuff musculature, normal sensory and motor testing, positive straight-leg-raise tests, and mild medial joint line tenderness in the bilateral knees. (Tr. 483). Dr. Fisher did not recommend left shoulder surgery for tendinosis because the condition is typically managed with physical therapy or steroid injections. (*Id.*). He prescribed a prednisone taper and suggested a rheumatology evaluation. (*Id.*).

On November 12, 2020, Mr. Simpson met with Amanda Springer, PA-C, for pain management. (Tr. 453). There, he complained of pain in all his joints that he characterized as aching, burning, sharp, shooting, stabbing, tender, tight, and throbbing. (*Id.*). He also reported numbness and tingling in his left kneecap and foot. (*Id.*). Physical therapy and moving his joints worsen his pain. (*Id.*). Physical examination revealed normal range of motion and mildly decreased strength with bilateral hip flexion. (Tr. 455). He endorsed pain with straight-leg-raise testing bilaterally. (*Id.*). Mr. Simpson declined to sign the pain management agreement because he uses recreational marijuana for pain control, did not want to be on medication other than ibuprofen, and was not interested in surgery. (Tr. 453). PA Springer ordered a lumbar MRI. (Tr. 456).

7

On December 1, 2020, Mr. Simpson returned to Dr. Fisher's office and reported the prednisone taper significantly reduced his shoulder pain and he felt slightly improved overall. (Tr. 472). Based on this improvement, Dr. Fisher thought it more likely that Mr. Simpson's joint pain stemmed from a rheumatologic condition rather than a specific joint issue. (*Id.*). He did not recommend surgical intervention. (*Id.*). Mr. Simpson again declined steroid injections. (*Id.*).

At a visit with Dr. Oberhauser on January 26, 2021, Mr. Simpson reported physical therapy worsened his back pain. (Tr. 766). He requested referrals to a neurosurgeon to evaluate his back pain and a hand orthopedist to address the median nerve entrapment in the right wrist. (*Id.*).

On February 2, 2021, Mr. Simpson presented at a telehealth session with Ryan Milks, PA-C, for a neurosurgical consultation. (Tr. 789). There, he reported low back pain with radiation to his legs, dullness in sensation in his right leg more than his left, and feeling his legs become weaker the further he walks. (*Id.*). The pain is worsened by standing or walking long distances and improved with lying down. (*Id.*). After reviewing prior imaging, PA Milks encouraged Mr. Simpson to consider steroid injections, ordered X-rays to evaluate for instability, and ordered an MRI to evaluate neural involvement in the lumbar spine. (Tr. 790). The MRI revealed a shallow central disc herniation at L2-L3, a diffuse disc bulge causing mild central canal stenosis at L4-L5, and a posterior disc bulge at L5-S1 without significant central canal or neural foraminal stenosis. (Tr. 793-94).

On July 27, 2021, Mr. Simpson met with Dr. Oberhauser and reported that everything still hurts. (Tr. 776). Dr. Oberhauser discussed returning to pain management for injections, doing more physical therapy, and medications for pain relief. (Tr. 775). Mr. Simpson declined all options and, when asked what he wanted to do for pain, he said he wanted to "continue to do nothing"

and be as minimally active as possible to avoid aggravating it. (*Id.*). At his next appointment on January 27, 2022, Dr. Oberhauser provided tizanidine for back pain. (Tr. 780).

## III.  MEDICAL OPINIONS

In November 2018, Mr. Simpson underwent a functional capacity evaluation (FCE). (Tr. 429-43). There, he complained of bilateral knee, shoulder, hip, and leg pain. (Tr. 429). In addition to assessing upper extremity functioning, positional tolerance, mobility, and capacities for lifting, pushing/pulling, and carrying, the FCE assessed whether Mr. Simpson put forth maximal physical effort during testing and how reliable his subjective reports of pain were. (Tr. 432-36). According to the FCE report, Mr. Simpson gave "variable levels of effort" throughout the testing procedure and his subjective reporting was deemed only "marginally reliable." (Tr. 434, 436). Mr. Simpson refused to participate in tests that he claimed would increase his pain. (Tr. 437). During the six-minute-walk test, Mr. Simpson indicated he would only walk down the hallway and back and then terminated the test. (*Id.*). He refused to perform a step-climbing test and any tests designed to evaluate his capacities for lifting, pushing/pulling, or carrying. (Tr. 438-41). The physical therapist who administered the tests determined that "[a]s a result of the test procedures, [Mr. Simpson's] physical work tolerances cannot be determined due to him refusing to perform many of the test procedures due to pain symptoms." (Tr. 442).

In April 2020, State agency medical consultant Abraham Mikalov, M.D., reviewed Mr. Simpson's medical records and determined he did not suffer from any severe medically determinable impairments, stating as follows:

> [Mr. Simpson] alleged arthritis pains pretty much in every joint and in low back. He reports only shoulder and knee pain to his doctor, as well as some chest pain. He does not follow prescribed [treatment] – he was prescribed topical pain management and referred to cardio workup but did not follow through. X-rays in

knees showed only mild bilateral arthritis and his [physical examination] showed normal [range of motion], no weakness. He does have high blood pressure . . . however there does not appear to be any secondary hypertensive complications. {Mr. Simpson's] conditions are non-severe.

(Tr. 66). On reconsideration in September 2020, State agency medical consultant Stephen Koch, M.D., reviewed updated medical records and determined Mr. Simpson can lift twenty pounds occasionally and ten pounds frequently; stand and/or walk for about six hours in an eight-hour workday and sit for six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; frequently climb ramps and stairs, kneel, and crouch; occasionally crawl; occasionally reach overhead with the bilateral upper extremities; and must avoid operating heavy machinery, commercial driving, and unprotected heights. (Tr. 76-77).

On December 14, 2020, Dr. Oberhauser completed a medical assessment and opined that Mr. Simpson can lift twenty pounds occasionally and ten pounds frequently; stand and walk for about two hours in an eight-hour workday; sit for less than two hours in an eight-hour workday and for fifteen minutes without interruption; never twist, crouch, or climb ladders; occasionally stoop and climb stairs; and is limited in reaching, handling, feeling, pushing, and pulling. (Tr. 458-59). She determined Mr. Simpson must have the opportunity to shift positions at will; lie down at unpredictable intervals throughout the day; avoid concentrated exposure to fumes, odors, dusts, gases, perfumes, and solvents; and avoid even moderate exposure to extreme temperatures and high humidity. (Tr. 459-60). In support of these limitations, Dr. Oberhauser cited Mr. Simpson's reports of shoulder pain with motion, knee pain with bearing weight and walking, and X-rays of the lumbar spine showing moderate-to-severe spondylosis and facet arthropathy at L5-S1. (Tr. 459).

On July 3, 2022, Mr. Simpson attended a consultative physical evaluation with Casey Norris, D.O. (Tr. 881-88). There, he stated he applied for disability based on low back, neck,

10

shoulder, and knee pain. (Tr. 887). Physical examination was largely normal, revealing only decreased shoulder strength and limited cervical and lumbar range of motion. (Tr. 884, 888). Dr. Norris determined Mr. Simpson "should be able to walk four to five hours out of an eight-hour day," "could probably be on [his] feet for a total of five hours out of an eight-hour day," "probably carry less than twenty pounds frequently and more than thirty pounds on occasion," and had functional limitations in climbing, stooping, and bending. (Tr. 888-89).

On October 18, 2022, Mr. Simpson met with Dr. Oberhauser and complained of widespread pain in his elbows, shoulders, wrists, fingers, back, hips, and knees. (Tr. 908). Physical examination revealed normal gait, no joint swelling, and normal movement of all extremities. (Tr. 909-10). An abdominal and pelvic CT showed disc space narrowing and endplate spurring, moderate at L5-S1 and mild at L4-L5, lower lumbar mild facet arthrosis, and subchondral sclerotic changes in both femoral heads that is most compatible with avascular necrosis. (Tr. 912-13).

## IV.    ADMINISTRATIVE HEARING

At the first hearing, Mr. Simpson testified he cannot work due to low back, shoulder, elbow, wrist, and knee pain, and all his joints hurt. (Tr. 46). He wakes up four or five times a night because his shoulders, arms, or legs hurt, and takes naps during the day. (Tr. 48). He limits himself to walking short distances, can stand for just five minutes at a time, sit for 40 minutes before he needs to adjust positions, and has difficulty bending at the waist. (Tr. 47-48). Mr. Simpson also will not pick up more than around ten pounds. (Tr. 48). Back pain, described as burning and pinching, radiates into his right hip and down the leg to his toes. (Tr. 54). His leg goes numb once or twice a year and gives out four or five times a year. (Tr. 53-54). Hand pain makes it difficult to write, open containers, use the restroom, brush his teeth, and hold the phone to his ear. (Tr. 51).

11

He also drops items he is holding and struggles with buttons and fasteners on his clothing. (Tr. 42).

At the second hearing, Mr. Simpson testified he is not a candidate for back surgery and declined surgery for his shoulders because the surgeon informed him it would not relieve his pain. (Tr. 540). His hands and wrists hurt when picking up or carrying even a gallon of milk and his shoulders hurt with overhead reaching. (Tr. 541-42). His knees and back hurt all the time, limiting his ability to stand and walk. (Tr. 542, 543). Mr. Simpson still has back pain, but the pain no longer radiates down his leg. (Tr. 544). He can stand for 10 or 15 minutes and walk for 20 to 25 minutes at a time. (Tr. 545). If he walks around the market, he needs several days to recover. (*Id.*). Mr. Simpson can sit in a soft chair with his feet up for about 90 minutes before he must shift positions. (*Id.*).

Medical expert John Kwok, M.D. testified that his review of the records led him to conclude Mr. Simpson has degenerative disc and degenerative joint disease in the lumbar spine, degeneration in both shoulders, and mild osteoarthritis in both knees. (Tr. 547). Dr. Kwok opined Mr. Simpson can lift and carry up to ten pounds on a continuous basis, twenty-five pounds frequently, and fifty pounds occasionally; sit for six hours and walk for six hours in an eight-hour workday; frequently reach overhead; frequently use the feet for pushing, pulling, and operating pedals; frequently climbing ramps and stairs and balance; occasionally stoop, crouch, crawl, and climb ladders, ropes, and scaffolds; and frequently work at unprotected heights and in proximity to heavy machinery. (Tr. 548-49). Dr. Kwok also determined these restrictions would apply as far back as mid-2018. (Tr. 549). On questioning from Mr. Simpson's representative about his hand and wrist complaints, Dr. Kwok acknowledged the EMG showed right median nerve entrapment at the

12

wrist and ulnar nerve entrapment at the elbow and the provocative tests on physical examination were positive and determined Mr. Simpson was further limited to frequent feeling and fingering. (Tr. 550-52). Although the medical evidence also included positive single-leg-raise tests and a finding of lower extremity weakness in November 2020, Dr. Kwok noted the lumbar spinal images revealed mild abnormalities and are not findings that would produce radiculopathy. (Tr. 554) ("the chances of radiculopathy existing with these types of findings are very small, clinically very small."). Dr. Kwok also explained that parts of the physical examination are not totally objective, especially where the response is dependent on the individual, and that Mr. Simpson's normal physical examinations imply the presence of intact physiology. (Tr. 555, 557). Dr. Kwok also reviewed Dr. Oberhauser's December 2020 opinion and concluded there was no evidence in the record supporting those limitations. (Tr. 550).[1]

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520, 416.920—to determine if a claimant is disabled:

1.     Was claimant engaged in a substantial gainful activity?

---

[1]     I have omitted a summary of the VE's testimony at the second hearing because it is not relevant to the issues implicated in Mr. Simpson's challenge to the Commissioner's denial of benefits.

2.      Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.      Does the severe impairment meet one of the listed impairments?

4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## The ALJ's Decision

At Step One, the ALJ determined Mr. Simpson had not engaged in substantial gainful activity since August 1, 2010. (Tr. 517). At Step Two, the ALJ identified the following severe impairments: disorders of the muscle, ligament, and fascia; bilateral knee osteoarthritis, status post leg fractures (per testimony); bilateral carpal tunnel syndrome; degenerative disc disease and degenerative joint disease of the lumbar spine; bilateral rotator cuff degenerative joint disease; and mild osteoarthritis. (*Id.*). At Step Three, the ALJ found Mr. Simpson does not have an impairment

14

or combination of impairments that meets or medically equals the severity of a listed impairment.

(Tr. 518).

The ALJ determined Mr. Simpson's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: Postural limitations of no climbing ladders, ropes, or scaffolds. Frequent climbing of ramps and stairs. Occasional stooping, crouching, and crawling. Frequent use of the bilateral lower extremities for operation of foot controls. Manipulative limitations of occasional use of the bilateral upper extremities for overhead reaching. Frequent use of the bilateral upper extremities for other reaching, handling, and fingering. Environmental limitations to avoid all exposure to moving mechanical parts, commercial driving, and high exposed places.

(Tr. 519).

At Step Four, the ALJ found Mr. Simpson cannot perform his past relevant work as a tree trimmer. (Tr. 526). At Step Five, the ALJ determined jobs exist in significant numbers in the national economy that he can perform. (Tr. 527). Therefore, the ALJ found Mr. Simpson was not disabled. (Tr. 528).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d

1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an

accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## DISCUSSION

Mr. Simpson argues the ALJ's finding that he retained the functional capacity for light work is not supported by substantial evidence. (ECF #9 at PageID 963). More specifically, he claims the ALJ did not properly evaluate Dr. Oberhauser's opinion because the ALJ did not address discrete pieces of evidence, including: (1) his report of lumbar pain on October 27, 2020; (2) X-rays showing spondylosis and facet arthropathy at L4-L5 and L5-S1; (3) a pain management treatment note indicating decreased lower extremity strength and positive bilateral straight-leg-raise tests; and (4) findings of positive straight-leg-raise tests in November and December 2020. (*Id.* at PageID 964-65). He takes particular issue with the ALJ's determination to not adopt Dr. Oberhauser's standing, walking, and sitting limitations. (*Id.* at PageID 964). Mr. Simpson also notes that the only other opinion from a treating or examining physician indicates he could not perform the full standing and walking requirements of light work. (*Id.* at PageID 965).

Because Mr. Simpson filed his application after March 27, 2017, medical opinions are evaluated under the regulations found in 20 C.F.R. §§ 404.1520c and 416.1920c. Under these revised regulations, the ALJ must articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* at §§ 404.1520c(b) & 416.920c(b).

The regulations eliminated the hierarchy of medical source opinions that previously gave preference to treating source opinions. The ALJ need not defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. *See Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors tending to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(c)(1)-(5) & 416.920c(c)(1)-(5). The ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors" of supportability and consistency. *Id.* at §§ 404.1520c(a) & 416.920c(a). With respect to supportability, the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion, the more persuasive the medical opinion will be. *Id.* at §§ 404.1520c(c)(1) & 416.920c(c)(1). Regarding consistency, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. *Id.* at §§ 404.1520c(c)(2) & 416.920c(c)(2).

An ALJ must explain how she considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See id.* at §§ 404.1520c(b)(2)-(3) & 416.920c(b)(2)-(3). That said, just because an ALJ does not specifically use the words "supportability" and "consistency" does not mean the ALJ failed to

18

consider those factors. *Hardy v. Comm'r of Soc. Sec.*, No. 2:20-cv-4097, 2021 WL 4059310, at *2 (S.D. Ohio Sept. 7, 2021).

Here, the ALJ evaluated Dr. Oberhauser's opinion as follows:

In December of 2020, Megan Oberhauser, [D.O.], the claimant's primary care provider, opined that the claimant can occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand or walk about two hours in an eight-hour day; and sit less than two hours in an eight-hour day. She indicated he can never twist, crouch, or climb ladders, and must avoid heat, cold, and humidity. This opinion is partially persuasive. The limitations in lifting and carrying described by Dr. Oberhauser are supported by the imaging studies of the claimant's shoulders, discussed above. However, the limitations in standing, walking, and sitting are not supported by her objective observations that the claimant has normal movement of his extremities and a normal gait, nor are they consistent with other evidence in the record, including normal ranges of motion of his hips and knees, full strength in his lower extremities, and intact reflexes, sensation, and coordination. While the claimant has some positive clinical findings related to his lumbar spine such as tenderness and decreased range of motion, the findings upon his imaging studies are described in generally mild terms, as Dr. Kwok point out in his testimony discussed above. Dr. Kwok concluded that the medical evidence of record does not support such extreme limitations as described by Dr. Oberhauser's opinion, and the undersigned concurs. Thus, upon further consideration as directed by the Appeals Council, Dr. Oberhauser's opinion remains less than fully persuasive.

(Tr. 524) (citations omitted).

Here, the ALJ properly evaluated Dr. Oberhauser's medical opinion in accordance with the regulations. He addressed the supportability and the consistency of the opinion, relying primarily on observations of normal clinical findings, including gait, extremity movement, range of motion, strength, reflexes, sensation, and coordination. After review of the record, the ALJ's conclusions as to the persuasiveness of Dr. Oberhauser's medical opinion are supported by substantial evidence as the record largely shows normal physical examinations. (Tr. 290-91, 295, 362-64, 374, 455, 464, 909-10). True, Mr. Simpson has pointed to several pieces of evidence the ALJ did not specifically address in the written decision, including one report of lumbar pain, one finding of hip weakness

19

on range of motion testing, and three instances of positive straight leg raise testing. But "[a]n ALJ need not discuss every piece of evidence in the record for [the ALJ's] decision to stand." *Thacker v. Comm'r of Soc. Sec.,* 99 F.App'x 661, 665 (6th Cir. 2004); *see also Kornecky v. Comm'r of Soc. Sec.,* 167 F.App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.").

Looking at the decision as a whole, it is clear that the ALJ considered all the evidence, including the findings Mr. Simpson believes establish his disability, such as the few abnormal findings on physical examinations and the images of his spine. Later in the decision, the ALJ explained why those findings did not support additional functional limitations in the RFC.

> Dr. Kwok further testified that he reviewed the opinion dated December 2020 . . . . He noted that while that opinion may have been based upon other factors known to the author that are not reflected in the record, the evidence in the record at issue does not support those limitations. Upon cross-examination, he testified that the claimant's clinical findings are not consistent with compression of the spinal nerve root causing radiculopathy in the upper or lower extremities, and that the objective findings upon imaging studies of the claimant's spine were described in generally mild terms, including "mild" central canal stenosis, and a "shallow" disc protrusion "mildly" impressing the subarachnoid space, which would be very unlikely to cause radiculopathy. He noted that while the claimant exhibited decreased strength in his lower extremities and a positive straight leg raising test upon one examination, these findings have a subjective component, and they were normal upon other examinations, which would not be possible if his related anatomical and physiological functions were no longer intact. He explained that for this reason, normal clinical findings are a more reliable measure of an individual's ability than abnormal findings.

(Tr. 523).

Finally, Mr. Simpson points out that Dr. Norris's opinion, the only other examining source opinion in the record, agrees that he could not perform the full standing and walking requirements of light work. (ECF #9 at PageID 965). But the ALJ adequately explained how he

20

considered the persuasiveness of Dr. Norris's opinion given the normal findings, stating in

relevant part:

> Dr. Norris's opinion is presented in prospective terms, *i.e.,* "should be able to," and "could probably," and it does not specify the extent of the claimant's limitations in climbing, stooping, and bending. Nor does it indicate how much more than 30 pounds the claimant can carry occasionally. Therefore, the persuasive value of this opinion is reduced. Regardless, these restrictions in carrying are generally consistent with the ability to perform light work. It is not clear why the claimant would be able to perform five hours of standing and walking as opposed to six, given the generally mild related findings upon Dr. Norris's examination, including full lower extremity strength, normal gait, normal ranges of motion of his lower extremity joints, a normal straight leg raising test, no signs of joint inflammation or swelling, and normal reflexes and sensation in his lower extremities. These objective findings do not support an inability to perform the standing and walking required of light work, which is only one hour more per day than indicated by Dr. Norris.

(Tr. 525).

Because the ALJ properly evaluated the persuasiveness of the opinion and his conclusions

are supported by substantial evidence, namely largely normal clinical findings, I decline to

recommend remand on this basis.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I

recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance

benefits and supplemental security income.

Dated: August 6, 2024

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

21

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).